**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KEVIN SMITH, a/k/a Bar-None
Royal Blackness,

        *Plaintiff-Appellant,*

        v.

JON OZMINT; GARY D. MAYNARD;
ROBERT WARD; GARY A. BOYD;
GENE NOLES; JAMES SLIGH; DEBRA
WISE; ALVIN GRABER; LESTER
HINSON, JR.; MS. HILL, OFC; DORIS
CURENTON; MARY STEWART; DEAN
DAY; MARCIA FULLER; T. W.
THOMAS; LAURIE BESSINGER;
BERNARD MCKIE; ASSOCIATE
WARDEN STEVENSON; SAMUEL
LATTA; JAMES CHRISTENSEN; WILLIE
MASON; HAROLD SCOTT; SERGEANT
SHIVERS; E. JENNINGS; E. REARDON;
J. KIRCHER; S. BROWN; M. HAYES;
ROLLAND MOODY; S. HORSELY;
JOEL MOORE; KENNETH JONES;
NURSE R. MURPHY; JOHN DOE; JANE
DOE; RICHARD P. STROKER; MARY
DAVENPORT ANDERSON; LEON LOTT,
JR.; DANIEL E. JOHNSON; DAVID
WILSON; CARLTON MEDLEY; DAVID
MILDRED; JAMES ROBINSON,

        *Defendants-Appellees.*

No. 07-6558

AKEEM MUHAMMAD,

          *Amicus Supporting Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Rock Hill.
Patrick Michael Duffy, District Judge.
(0:04-cv-01819-PMD)

Argued: May 14, 2009

Decided: July 31, 2009

Before MICHAEL, KING, and GREGORY, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge King and Judge Gregory joined.

**COUNSEL**

**ARGUED:** Cecily Elizabeth Baskir, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Andrew Lindemann, DAVIDSON & LINDEMANN, PA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Steven H. Goldblatt, Director, Kelly A. Anderson, Student Counsel, Zheyao Li, Student Counsel, Daniel E. Shuey, Student Counsel, Kimberly Witherspoon, Student Counsel, GEORGETOWN UNIVERSITY LAW CENTER, Washington, D.C., for Appellant. Akeem Muhammad, Raiford, Florida, Amicus Supporting Appellant.

## OPINION

MICHAEL, Circuit Judge:

Kevin Smith,* a South Carolina prisoner, appeals the district court's award of summary judgment to twenty-six South Carolina Department of Corrections officials and employees (collectively, the SCDC) on (1) his claim asserted under the Religious Land Use and Institutionalized Persons Act (RLUIPA) and (2) his claims alleging constitutional violations relating to excessive force and conditions of confinement. Smith contends that the SCDC violated his RLUIPA rights when, in contravention of his religious beliefs, it forcibly shaved his head under the Maximum Security Unit (MSU) grooming policy. Because the SCDC failed to meet its burden to show that the MSU policy of forcible grooming is the least restrictive means to further a compelling governmental interest, we vacate the summary judgment granted to the SCDC on Smith's RLUIPA claim. The SCDC failed in its proffer because it relied on an affidavit, which was filed in another case and which did not address administrative burdens and security requirements in the MSU, where the grooming policy at issue was enforced. The RLUIPA claim requires a remand for further consideration. We affirm the district court's award of summary judgment to the SCDC on Smith's constitutional claims.

### I.

Smith is an inmate in the MSU at Kirkland Correctional Institution in South Carolina. SCDC maintains two specialized housing units, the MSU and the Special Management Unit (SMU), for prisoners requiring greater monitoring and supervision than the general prison population. The MSU provides the higher level of security and is designed for inmates

---

*We refer to Smith as his name appears in the case caption even though he now prefers and uses the name Bar-None Royal Blackness.

who "have demonstrated an unwillingness to conform to the rules and regulations of [the SMU], who have been charged with violent criminal behavior committed while in the general [prison] population, and/or for whom emergency placement has been ordered." J.A. 651. Common reasons for placement in the MSU include "violent participation in a riot or other institutional disorder," "violent escapes or escape attempts with force," and "seizing and holding a hostage." J.A. 651-52. MSU inmates are essentially confined to their cells except for an hour of exercise per day, five days a week. When MSU inmates are permitted to leave their cells, they are "restrained with leg irons, security cuffs, and/or belly chains." J.A. 663.

The MSU has a grooming policy (MSU grooming policy or MSU policy) that requires inmates "to wear close-cropped haircuts for security reasons." J.A. 658. It also provides that "[i]nmates may . . . be given forced haircuts or shaves if they refuse to comply with the haircut and shave schedule." J.A. 664. The MSU grooming policy, including its provision authorizing the use of force, has been in effect since at least January 1, 2002. Smith, who is a practicing Rastafarian, refused to comply with the grooming policy because of his religious beliefs. As a result, MSU employees forcibly shaved Smith's head with clippers on at least two occasions: on November 9, 2002, and on August 13, 2003.

The SCDC also has a grooming policy (SCDC grooming policy or SCDC policy) applicable throughout the Department of Corrections that requires male inmates to keep their hair "neatly cut (not to exceed one [1"] inch in length) and [it] must remain above the shirt collar and above the ear (not touching the ear)." J.A. 388. A May 1, 2004, amendment to the SCDC grooming policy authorizes prison employees to forcibly administer haircuts to inmates who refuse to comply. Prior to that change, inmates in the general population who refused to comply with the SCDC grooming policy were not forcibly shorn, but were reclassified and transferred to the SMU, where security arrangements are more restrictive. The

current SCDC policy is essentially identical to the MSU policy: both require short haircuts and authorize prison employees to forcibly groom inmates. Smith, however, was forcibly shorn under the MSU policy, which permitted the use of force at the time of the 2002 and 2003 incidents challenged by him. The SCDC policy was only amended to permit the use of force effective May 1, 2004.

The first challenged incident occurred on November 9, 2002, when about five correctional officers wearing protective gear entered Smith's MSU isolation cell and subdued him by forcing him to the floor and then attaching leg and arm restraints. In the first thirty seconds after the officers entered Smith's cell, the officers used physical force against him, including pushing, pulling, and (possibly) hitting. The officers were in Smith's cell for approximately two minutes and fifty seconds before leaving the cell with Smith in full restraints. Thereafter, the officers forcibly moved Smith to a different room and shaved his head.

Correctional officers again enforced the MSU grooming policy against Smith on August 13, 2003. Smith was in a recreation yard wearing handcuffs when the officers entered the yard and sprayed mace in his face. At the outset Smith reminded the officers that he was wearing handcuffs, but the SCDC says that an "inmate[ ] must be treated as if [he is] not restrained until the restraints can be verified by correctional officers." J.A. 367. Thus, according to the SCDC, its officers used mace to subdue Smith as a part of the effort to make sure that he was adequately restrained. The chemicals burned Smith's eyes and skin and caused him difficulty in breathing. The officers removed Smith to a separate room and helped him wash and clean his face. His head was then shaved. Smith complained of injuries and received medical care at the correctional facility after both the November 9, 2002, and August 13, 2003, incidents. Correctional officers filmed both incidents, and the video recordings are in the record.

After exhausting administrative remedies, Smith filed a *pro se* complaint alleging that the SCDC violated his rights under RLUIPA, 42 U.S.C. §§ 2000cc to 2000cc-5. Smith further alleges that excessive force was used against him during the November 9, 2002, and August 13, 2003, incidents in violation of his constitutional rights and that conditions of confinement within the MSU violate the Constitution in several respects. The district court granted summary judgment to the SCDC on all of Smith's claims, and he appeals.

## II.

We review the district court's grant of summary judgment de novo. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004). Summary judgment is appropriate if "the pleadings . . . and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We construe the evidence in the light most favorable to Smith, the non-moving party, and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.

RLUIPA, in relevant part, provides that:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). "Government" includes any official of "a State . . . or other governmental entity created under the authority of a State" and "any other person acting under color of State law." *Id*. § 2000cc-5(4)(A). The defendants here, who are officials or employees of the SCDC and whom we refer to collectively as the "SCDC," fit within that definition.

"If a plaintiff produces prima facie evidence" of an RLUIPA violation, "the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the [policy] or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." *Id*. § 2000cc-2(b). In particular, the government must prove that the burden in question is the least restrictive means of furthering a compelling governmental interest. *Id*. § 2000cc-1(a). As to those elements on which it bears the burden of proof, a government is only entitled to summary judgment if the proffered evidence is such that a rational factfinder could only find for the government. *Gooden v. Howard County, Md.*, 954 F.2d 960, 971 (4th Cir. 1992) ("[W]here . . . the movant would have the burden of persuasion at trial, the summary judgment burden is a correspondingly heavy one.").

## A.

Invoking RLUIPA, Smith challenges the MSU grooming policy that requires him to have close-cropped hair and authorizes prison employees to forcibly shave his head. The SCDC does not challenge Smith's allegation that his refusal to cut his hair stems from a genuinely held religious belief. Rather, the SCDC first argues that it is entitled to summary judgment because Smith cannot show that the grooming policy imposes a substantial burden on his religious exercise.

SCDC attempts to rely on our decision in *Hines v. South Carolina Department of Corrections*, 148 F.3d 353 (4th Cir. 1998), a pre-RLUIPA case involving a prior SCDC grooming

policy for the general prison population under which "[n]o prisoners [were] forcibly shaved or shorn." *Id.* at 356. In *Hines* we rejected a Free Exercise Clause challenge to the SCDC grooming policy, holding that "although the Grooming Policy may have an incidental effect of preventing the Inmates from wearing their hair and beards as their religion prescribes . . . the Grooming Policy is a neutral and generally applicable regulation and, therefore, does not violate the Free Exercise Clause." *Id.* at 358. SCDC argues that *Hines* requires us to conclude that the MSU grooming policy only "incidentally effects" religious exercise and therefore cannot impose a substantial burden on Smith's religious exercise under RLUIPA. We disagree.

Our holding in *Hines* is based on the established neutrality principle "that if [burdening] the exercise of religion . . . is not the object of [a provision] but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment [Free Exercise Clause] has not been offended." *Employment Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 878 (1990); *see also Hines*, 148 F.3d at 358 (concluding that grooming policy had only an incidental effect on religious exercise because "[t]here is no suggestion that the Grooming Policy was enacted to burden anyone's free exercise rights, or was at all motivated because of the religious beliefs or practices of any inmate"). We have previously held that *Smith*'s neutrality principle does not foreclose liability under RLUIPA, which Congress enacted to protect prisoners and other institutionalized persons who face substantial burdens in practicing their religious faiths, including substantial burdens that are imposed in an incidental manner. *See Madison v. Riter*, 355 F.3d 310, 315 (4th Cir. 2003).

The MSU grooming policy imposes a substantial burden on religious exercise if it "'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs,' or . . . forces a person to 'choose between following the precepts of her religion and forfeiting [governmental] benefits, on the

one hand, and abandoning one of the precepts of her religion . . . on the other hand.'" *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006) (quoting *Thomas v. Review Bd. of Ind. Employment Sec. Div.*, 450 U.S. 707, 718 (1981), and *Sherbert v. Verner*, 374 U.S. 398, 404 (1963)). We may "not judge the significance of the particular belief or practice in question." *Id.* at 187 n.2. Indeed, "religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7).

The policy requiring Smith to cut his hair—and implementing that policy with physical force—compelled him to modify his behavior in violation of his genuinely held religious beliefs. Accordingly, we conclude that the MSU grooming policy substantially burdened Smith's religious exercise. *See also Longoria v. Dretke*, 507 F.3d 898, 903 (5th Cir. 2007) (concluding that similar allegations were sufficient to state a claim that grooming policy substantially burdened religious exercise); *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (concluding that grooming policy substantially burdened religious practice).

## B.

SCDC also argues that the summary judgment record establishes that the MSU grooming policy furthers a compelling governmental interest and is the least restrictive means of furthering that interest. As to these elements, the SCDC bears the burden of persuasion, and summary judgment is only appropriate if a rational factfinder would necessarily find that the grooming policy withstands scrutiny under RLUIPA. *See Gooden*, 954 F.2d at 971. Of course, due deference must be given "to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citation omit-

ted). Security concerns deserve "particular sensitivity." *Id.* at 722.

To meet its burden to show a compelling interest, the SCDC's "first job" is "to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs." *Lovelace*, 472 F.3d at 190. The only justification offered for the MSU grooming policy that is specific to the MSU is the policy itself: "Inmates in all levels of MSU will be required to wear close-cropped haircuts *for security reasons*." J.A. 658 (emphasis added). This conclusory, one-sentence explanation does not, by itself, explain why the security interest is compelling. *See Lovelace*, 472 F.3d at 190.

We are puzzled that the primary support offered by the SCDC for the MSU grooming policy is an affidavit that deals solely with why a different category of inmates, *SMU* inmates, were subjected to an amended SCDC grooming policy that allows forced haircuts. The affidavit, signed by Robert E. Ward, SCDC's Director of the Division of Operations, has nothing to do with the MSU, where Smith is housed. Indeed, the affidavit was prepared and submitted in another case.

According to Ward, the "[f]irst and perhaps most important[ ]" reason for the SCDC policy requiring general population and SMU inmates to have close-cropped hair was the shortage of space in SMUs. J.A. 380. Before the forced grooming standard applied, inmates in the general population could grow long hair in violation of the grooming policy for any reason—for example, to satisfy a personal preference unrelated to religious belief, to avoid a work assignment, or to secure placement in a private cell — and then be assigned to the SMU. These inmates were taking up space in SMUs that was needed for inmates presenting security and disciplinary problems. This reasoning, however, does not bear on the

MSU grooming policy: MSU inmates who grew long hair in violation of policy were not transferred to the SMU, a lower security unit.

According to Ward, the second reason for not accommodating SMU inmates who want long hair is that housing inmates in the SMU requires additional manpower and is thus more costly. For example, when SMU inmates are taken from their cells for recreation or showering, they are strip searched, placed in restraints, and escorted by officers. However, there is no record of inmates ever straining manpower needs by seeking transfer to the MSU, where Smith is housed, simply to have long hair. The SCDC offers no evidence that the MSU grooming policy reduces manpower needs or costs.

In addition to the overriding concerns about space and manpower needs in the SMU, which have no relevance to the MSU grooming policy, Ward mentions concerns about hygiene and security. With respect to hygiene, Ward says that long hair makes it "more unsanitary for officers to conduct needed searches." J.A. 382. Smith responds that latex gloves and masks could be used in any body search, thereby protecting the officers.

With respect to security concerns, Ward says that long hair provides a place to hide contraband, renders an inmate more susceptible to assault (hair pulling), and can be shorn after an escape to alter appearance. These security concerns, however, were discussed in the context of SCDC's experience with SMU inmates, not MSU inmates. For example, Ward did not discuss whether (or to what extent) there was a risk of contraband in the MSU, whether MSU inmates are exposed to assault by other inmates, or whether (or to what extent) there is a risk of escape from the MSU.

The major failing of the Ward affidavit is that it was not written to address this case. Specifically, it was not written to establish that the MSU grooming policy — which allows the

use of force to achieve compliance — is in furtherance of a compelling governmental interest. Yet the district court relied heavily on the Ward affidavit in granting summary judgment to the SCDC. In short, the Ward affidavit does not permit the conclusion on summary judgment that the MSU forced grooming policy advances a compelling interest.

Even if we assume that the space utilization, hygiene, and security concerns mentioned in the Ward affidavit are sufficient to establish a compelling governmental interest in maintaining the MSU forced grooming policy, the SCDC must demonstrate that the policy is the least restrictive means of furthering that interest. In other words, the SCDC must provide a substantive, relevant explanation as to why drastic haircuts, administered through physical force, are the least restrictive means of enforcing the compelling interest advanced. Again, due deference must be given to any substantive, relevant explanation.

In an effort to meet the least restrictive means requirement, the SCDC, once more relying on the Ward affidavit, makes the conclusory argument that uniform application of the forced grooming policy is necessary. Ward says only that: "I am not aware as to how the objectives discussed . . . could be accomplished without making all inmates uniformly subject to the grooming standards." J.A. 383. *But see Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 546 U.S. 418, 436 (2006) (noting that under the Religious Freedom Restoration Act of 1993 the government may not merely "echo[ ] the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions"). The statement falls short in several respects.

First, Ward says nothing about the need to administer forced head shaving in the MSU, where Smith is housed. As we have already noted, head shaving in the MSU does nothing to free up needed space in the SMUs, the main objective discussed in the Ward affidavit. Similarly, the hygiene and

security concerns listed by Ward were discussed in the context of dealing with SMU prisoners, not MSU prisoners who are in more restricted custody. Second, Ward makes no attempt whatsoever to explain that hygiene and security concerns in the MSU cannot be accommodated without forcibly shaving the heads of prisoners who wear long hair due to religious belief. *See Hines*, 148 F.3d at 356 (upholding prior SCDC grooming policy under the First Amendment, but noting that "[n]o prisoners are forcibly shaved or shorn"); *McRae v. Johnson*, 261 F. App'x 554, 559 (4th Cir. 2008) ("We note that one of the key features of the [Virginia Department of Corrections'] Grooming Policy that supports the district court's least restrictive means conclusion is that the VDOC's Grooming Policy does not mandate the forcible cutting of an inmate's long hair and/or beard."). Finally, Ward does not explain why the SCDC is able to deal with hygiene and security concerns with respect to female inmates who must keep their hair "*at least* one (1) inch long." J.A. 388 (emphasis added).

In sum, the SCDC has not demonstrated in the summary judgment record before us that its policy of forcibly shaving the heads of MSU inmates who wear long hair as a matter of religious belief furthers a compelling governmental interest in space utilization, hygiene, and security by the least restrictive means. In making this determination, we emphasize that the SCDC's key item of evidence, the Ward affidavit, was simply not on point. In light of the SCDC's failure to meet its burden, we vacate the summary judgment granted to the SCDC on Smith's RLUIPA claim. The case will be remanded for further proceedings on this claim.

IV.

Smith also alleges that unconstitutionally excessive force was used against him during the November 9, 2002, and August 13, 2003, incidents when he was extracted from his cell for forced haircuts. An excessive force claim requires a

plaintiff to prove (1) that force was applied "maliciously and sadistically for the very purpose of causing harm" and (2) that he suffered more than de minimis pain or injury. *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996) (internal quotation omitted).

Smith and the SCDC offer very different versions of the facts. Through affidavits submitted by Smith's fellow inmates, Smith claims, for example, that on November 9, 2002, correctional officers "ramm[ed] [his head] into the wall, pok[ed] at his eyes with their hands, punch[ed] and kick[ed] him in his body, slapp[ed] him several times hard across his face, and then [held] him down, face first, in scalding hot water while in mechanical restraints." J.A. 543. In contrast, the SCDC contends that as officers prepared to enter Smith's cell to put him in restraints, Smith sought to thwart them by spreading soap and water on the floor, throwing human waste, and possessing a metal shank.

We, of course, may not make credibility determinations. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991). But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). We have reviewed the video recordings of both incidents and conclude that no reasonable jury could find that correctional officers—on either November 9, 2002, or August 13, 2003—applied force "maliciously and sadistically for the very purpose of causing harm." *Williams*, 77 F.3d at 761. We thus affirm the district court's grant of summary judgment to the SCDC on Smith's excessive force claims.

V.

Lastly, Smith claims that he was subjected to several unconstitutional conditions of confinement, including (1) the

continuous and indefinite exposure to extremely harsh conditions, (2) the exposure to unhealthful ventilation and unsanitary drinking water, and (3) after the November 9, 2002, incident, the temporary confinement in a cell that contained human blood and feces.

To demonstrate that conditions of confinement constitute cruel and unusual punishment, Smith must (1) establish that prison officials acted with "deliberate indifference" and (2) prove extreme deprivations of basic human needs or "serious or significant" pain or injury. *Williams*, 77 F.3d at 761 (internal quotations omitted). The summary judgment record establishes that no reasonable jury could find that both of these elements were met with respect to Smith's allegation relating to his indefinite confinement in the MSU and his allegations about the ventilation and drinking water. Moreover, we agree with the district court that Smith's allegations about the condition of the cell in which he was placed following the November 9, 2002, incident are contradicted by the video record. Accordingly, we also affirm the district court's grant of summary judgment on these claims.

## VI.

For the foregoing reasons, the judgment is affirmed in part and vacated in part, and the case is remanded to the district court for further proceedings on Smith's RLUIPA claim.

*AFFIRMED IN PART*,
*VACATED IN PART*,
*AND REMANDED*