RHESA H. BARKSDALE, Circuit Judge,
dissenting in part:
Amazingly, akin to the adage about “inmates running the asylum”, and contrary to the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5, the able majority is permitting this inmate to run the penitentiary. When combined with two other adages — “no good deed goes unpunished” and “don’t lose sight of the forest for the trees” — the true character of this action is revealed. In that light, for the issues remanded for further proceedings, the majority’s application of RLUIPA’s compelling-interest standard, 42 U.S.C. § 2000cc-1(a)(2), is contrary to precedent and imper-missibly substitutes the majority’s judgment for that of prison officials. Along that line, the majority ignores Moussaza-deh’s fault, through his serious disciplinary violations, in bringing about the deprivation about which he complains. Therefore, although I join the majority’s denial of reassignment, Maj. Opn. at 796 n. 9, and join, dubitante, its holdings that Moussaza-deh has met his threshold exhaustion and sincerity requirements, Maj. Opn. at 790, 792, 795-96, I must respectfully dissent from my esteemed colleagues’ vacating judgment for TDCJ and remanding for further proceedings on: whether TDCJ has shown a compelling governmental interest; and whether it has adopted the least restrictive means of achieving that interest (remanded issues).
I.
In granting summary judgment to TDCJ, the district court’s comprehensive and detailed opinion based judgment on failure to satisfy the exhaustion and sincer *797 ity issues, and, therefore, did not reach the remanded issues. Moussazadeh v. Tex. Dep’t of Criminal Justice, No. G-07-574, 2011 WL 4376482 (S.D.Tex. Sept. 20, 2011). No authority need be cited for our ability to affirm the summary judgment based on the issues that are instead being remanded. These issues were raised in district court.
Along that line, the opinion provides compelling support for why Moussazadeh’s claim fails for the remanded issues. The following two paragraphs from that opinion shine a piercing light on what is really afoot:
TDCJ-CID defendants also note that Moussazadeh did not request a transfer [from the Stiles Unit] back to the Stringfellow Unit for religious reasons [where a free kosher diet is available] when he became eligible for such transfer and that he filed no grievances complaining that he was denied kosher meals or any religious practice on the Stiles Unit [to which he had been transferred for disciplinary violations]. They further note that Moussazadeh voluntarily committed major disciplinary violations [at Stiles] that resulted in a change of his custodial classification, thereby, depriving him of the opportunity to transfer back to the Stringfellow Unit, where he could freely obtain kosher food.
Moussazadeh’s conclusory declaration does not demonstrate that his professed religious need for a kosher diet motivates his actions or that he has attempted to reform his ways and return to keeping kosher during his two-year incarceration on the Stiles Unit. Rather, his personal desire to harass defendants with an unnecessary lawsuit took precedence, and he was willing to sacrifice his religious dietary beliefs in favor of this secular pursuit. Indeed, he would be without any access to kosher food to this day had defendants not attempted to accommodate his dietary beliefs.
Id. at *14-15 (citations omitted).
In the light of these penetrating comments, Moussazadeh asserts here: “the district court suggested that Moussazadeh brought all of this trouble on himself by ‘voluntarily committing] major disciplinary violations’ ”. In truth, Moussazadeh knows the district court has pinpointed exactly what he is attempting. He even characterizes this correct statement of fact as an expression of “remarkable hostility”, requesting — unsuccessfully—this action’s being reassigned to a new judge on remand. In other words, he was aware that any hope of success depended on pulling the wool over the eyes of a new judge; the extremely able district judge sees this claim for what it is with 20/20 vision.
II.
In not affirming the summary judgment on the remanded issues, the majority errs in two ways. First, it applies RLUIPA’s compelling-interest standard as if Moussa-zadeh’s claim were to be analyzed in a context other than RLUIPA, such as under the Fourteenth Amendment. In that regard, RLUIPA does not require the exacting review associated with court-created strict scrutiny in such other contexts; indeed, such a harsh standard contravenes the Act’s purpose. Second, in refusing to recognize what is really in play, the majority ignores TDCJ’s having already provided Moussazadeh the religious benefit he seeks, and his having lost access to it through his repeated, serious disciplinary infractions.
A.
The majority cites City of Boerne v. Flores, 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), to support its con- *798 elusion that a very demanding standard of review is appropriate in analyzing TDCJ’s kosher-food policy. Maj. Opn. at 795. There, the Court addressed the constitutionality of RLUIPA’s predecessor, the Religious Freedom Restoration Act (RFRA). City of Boeme, 521 U.S. at 511, 117 S.Ct. 2157. As the majority notes, City of Boeme stated: the test for the “least restrictive means of achieving [a compelling] interest” is the most rigorous in all of constitutional law. Id. at 534, 117 S.Ct. 2157. This standard is often referred to as “fatal in fact”, because it often leads to the challenged government policy’s being struck down. E.g., Bernal v. Fainter, 467 U.S. 216, 219 n. 6, 104 S.Ct. 2312, 81 L.Ed.2d 175 (1984).
What the majority fails to take into consideration is that Congress’ use in RFRA of this standard, constituting a “considerable congressional intrusion into the States’ traditional prerogatives ... to regulate for the health and welfare of their citizens”, is part of the reason why, in City of Boerne, RFRA was held unconstitutional. 521 U.S. at 534, 117 S.Ct. 2157. Therefore, in the subsequent RLUIPA context, the standard is necessarily less stringent than its language suggests. Precedent from the Supreme Court, our court, and other circuits bears this out.
Our court has already applied RLUIPA to kosher food vel non in TDCJ prisons. Baranowski v. Hart, 486 F.3d 112 (5th Cir.2007). In Baranowski, the inmate complained of TDCJ’s complete denial of kosher food. Id. at 116-19. Our court held: although failure to provide such food did work a substantial burden on the inmate’s religious practice, TDCJ could not be forced to add kosher food to its menu:
Turning to the compelling interest test, Defendants must show that their dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling governmental interest. As the Supreme Court recently explained, “ ‘[c]ontext matters’ in the application of that standard.” Cutter [v. Wilkinson], 544 U.S. [709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005)], (quoting Grutter v. Bollinger, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003)). Courts should apply the “compelling governmental interest” standard with “ ‘due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.’ ” Id. (quoting S.Rep. No. 103-111, at 10 (1993) 1993 U.S.C.C.A.N. 1892, 1899). RLUIPA, in other words, is not meant to elevate accommodation of religious observances over the institutional need to maintain good order, security, and discipline or to control costs. See Lovelace v. Lee, 472 F.3d 174, 190 (4th Cir.2006).
Id. at 125. This holding was consistent, of course, with the Supreme Court’s opinion in Cutter, which held:
We do not read RLUIPA to elevate accommodation of religious observances over an institution’s need to maintain order and safety. Our decisions indicate that an accommodation must be measured so that it does not override other significant interests. In [Thornton v.] Caldor, [472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985)] the Court struck down a Connecticut law that “arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate^] as their Sabbath.” 472 U.S. at 709, 105 S.Ct. 2914. We held the law invalid under the Establishment Clause because it “unyield-ingly] weighted]” the interests of Sab-batarians “over all other interests.” Id., at 710, 105 S.Ct. 2914, 86 L.Ed.2d 557. *799 We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a “compelling governmental interest” standard, see supra, at 2118, “[c]ontext matters” in the application of that standard. See Grutter v. Bollinger, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. See, e.g., 139 Cong. Rec. 26190 (1993) (remarks of Sen. Hatch). They anticipated that courts would apply the Act’s standard with “due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.” Joint Statement 16699 (quoting S.Rep. No. 103-111, at 10, U.S.Code Cong. & Admin.News 1993, pp. 1892, 1899, 1900).
Cutter, 544 U.S. at 722-23, 125 S.Ct. 2113.
Baranowski thus established that maintaining good order and controlling costs were included in such “compelling interests”, and held TDCJ’s policy of providing no kosher food whatsoever was “the least restrictive means of furthering” those interests. Baranowski, 486 F.3d at 125-26; 42 U.S.C. § 2000cc-l. Despite the majority’s attempt to distinguish the cases on their facts, Maj. Opn. at 795-96, Baranow-ski’s admonition that RLUIPA does not allow religious accommodation to overrun considerations of prison administration is general in scope. As discussed, Baranow-ski held TDCJ did not violate RLUIPA’s compelling-interest standard when it provided no kosher-food options. Accordingly, how can it violate that standard now by providing free kosher meals at one unit and making them available for purchase at several others? The majority posits, for example, that the increased cost of providing free kosher meals outside Stringfellow would be relatively minimal. Maj. Opn. at 794-95. Even if correct, that is for prison officials, not our court, to add to the mix for their decision in this instance.
Other courts have similarly determined RLUIPA’s compelling-interest standard is more forgiving to prison systems than the court-created, strict-scrutiny standard normally is to government policies. For example, in Hoevenaar v. Lazaroff, the inmate wanted to grow a “kouplock”, a small section of hair at the base of the skull that is grown longer than the rest of the person’s hair, to conform with his religious practice. 422 F.3d 366, 367 (6th Cir.2005). The Ohio prison warden defended his system’s absolute ban on long hair, noting its security interests in • preventing inmates from hiding contraband in their hair and eliminating an easy way for recently-escaped inmates to quickly change their appearance (ie. by cutting their hair). Id. at 369.
The district court ruled: because the inmate was classified only as “medium security” and in bad health, his kouplock was unlikely to pose a security threat; and the warden should have taken that into account in applying the hair-length rule to him. Id. at 368. The Sixth Circuit reversed because the district court “did not give proper deference to the opinions of ... veterans of the prison system”. Id. at 371. When analyzing a RLUIPA claim, courts must accord “requisite deference to the expertise and experience of prison officials” in their approach to the prison system’s compelling interests and the appropriate means of achieving them. Id.
This more deferential standard is a far cry from court-created strict scrutiny, in which the whole point is for the court to apply its own judgment to determine whether a government policy is sufficiently *800 narrowly tailored to a truly compelling interest. See Johnson v. California, 543 U.S. 499, 512-13, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). In this context, the summary judgment record demonstrates there is no genuine dispute of material fact that necessitates the remanded issues.
Nevertheless, the majority has imper-missibly substituted its judgment for that of the professionals at TDCJ, including implicitly accepting an inmate’s assessment of whether granting his wishes poses a security problem. Moussazadeh contends there is no reason to believe what worked at Stringfellow would not work at Stiles, despite TDCJ’s having shown the inmates housed at Stiles tend to be far more dangerous than those at String-fellow. The majority dismisses this clear difference in security situations as a “bare assertion! ]”, Maj. Opn. at 794, and adopts Moussazadeh’s analysis, despite the obvious fact that “a prisoner’s view of what promotes prison security is hardly objective”. Borzych v. Frank, 439 F.3d 388, 391 (7th Cir.2006) (Easterbrook, J.).
Moussazadeh’s alternative solution — that he and other Orthodox Jewish inmates be guaranteed they will never be transferred away from Stringfellow — presents a similarly obvious security concern. String-fellow is not designed to house TDCJ’s most dangerous inmates, and introducing some of those offenders into Stringfellow’s environment would change the facility’s entire character. Pursuant to the Supreme Court’s admonition in Cutter, Moussazadeh’s religious diet cannot be elevated above these legitimate security concerns. 544 U.S. at 723, 125 S.Ct. 2113.
Moreover, TDCJ has presented legitimate concerns that granting Moussazadeh special treatment will not end there. For example, the cost and security concerns associated with providing him free kosher meals at one of TDCJ’s most dangerous prisons would likely multiply, as “inmates of other faiths would seek similar privileges”. Baranowski, 486 F.3d at 118 (quoting testimony of TDCJ official).
These are but a few examples of the legitimate security and cost burdens TDCJ has resolved. The majority should have deferred to the judgment of prison officials on these questions and, accordingly, affirmed the summary judgment.
B.
Moreover, in assessing whether to affirm the summary judgment on the remanded issues, the majority refuses to recognize what truly is at issue. Moussa-zadeh’s disciplinary violations have caused this litigation to drag on. They should be an important factor in affirming the summary judgment.
When housed at Stringfellow, Moussaza-deh was given exactly what he seeks now: kosher food provided free of charge in the prison dining hall. He is no longer housed at Stringfellow — not because TDCJ chose to move him away from the kosher kitchen there, but because prison officials found cellular phone parts, cash, an iPod, hand-rolled cigarettes, a lighter, and marijuana in his cell. This major disciplinary infraction, which the majority glosses over, Maj. Opn. at 785-86, 787, downgraded Moussa-zadeh’s security status; as a result, he was no longer eligible for housing at String-fellow. Therefore, he was moved because of his refusal to follow well-known and necessary prison rules against contraband; yet TDCJ made a special effort to continue accommodating his claimed desire to keep kosher by transferring him to Stiles, where he could buy kosher food.
Once there, Moussazadeh did not reform his behavior in order to improve his security status and earn a transfer back to Stringfellow. On the contrary, his wife smuggled more cellular phone parts to him during a visit to Stiles. Further, even *801 though he has been eligible for transfer back to Stringfellow during part of his time at Stiles, as of oral argument for this appeal he had never requested the transfer. At base, Moussazadeh is demanding what he had not even tried to obtain for himself. Worse, he is seeking to undermine the prison system’s disciplinary process. The district court recognized this fault on the inmate’s part. Yet the majority, in refusing summary judgment to TDCJ, does not consider the conduct a factor in its decision.
The Texas prison system should not be required to choose between: giving up its right to transfer, for disciplinary reasons, inmates who keep kosher; or incurring financial and security hardships in order to accommodate, even more robustly than it already does, such inmates when they commit disciplinary violations. Our precedent is unequivocal in holding RLUIPA is not meant to impose such hardships on prison officials’ ability to perform their difficult and dangerous jobs. Baranowski, 486 F.3d at 125.
III.
Consistent with RLUIPA, proper deference must be accorded decisions by prison officials. And, Moussazadeh’s conduct in prison should result in even more deference being accorded. Unfortunately, the majority does just the opposite. Therefore, I must respectfully dissent from the summary judgment’s not being affirmed.